UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-10017-CR-MARTINEZ

UNITED STATES OF AMERICA,

  Plaintiff,

vs.

STEVEN RICHARD KOCIS, et al.,

  Defendants.

_____

**REPORT AND RECOMMENDATION**

  THIS CAUSE is before the Court on defendant **Jonathan Wesley King's** Motion to Suppress Evidence and Statements (DE 40), which was referred to United States Magistrate Judge, Lurana S. Snow, for report and recommendation.

  The defendants are charged with conspiracy to smuggle aliens into the United States and two substantive counts of alien smuggling. Defendant King seeks to suppress statements made on the ground that federal agents questioned him after he had requested an attorney. The motion also challenges the boarding and search of the defendants' vessel, but these claims were withdrawn by counsel for the defendant at the conclusion of the evidentiary hearing, which was conducted on December 12, 2011.

**I. FACTS PRESENTED**

  United States Customs Agent Antonio Giammillaro testified that he has been imposed by the United States Customs Service since 1998, prior to which he served in the United States Coast Guard for seven years. Currently Agent Giammillaro supervises the Key Largo Marine Unit, which patrols Customs waters and interdicts individuals who are engaged in smuggling contraband or human trafficking. The agent explained that Customs waters extend twelve miles from the United States coast.

During the early morning hours of September 9, 2011, Agent Giammillaro was operating a Customs vessel which was patrolling Angelfish Creek near Key Largo, Florida. He had with him a two-man crew: Customs Border Protection (CBP) Agents Babcock and Rodriguez.

The patrol vessel was equipped with lights on both sides and displayed the words "US Customs" on each side of the hull. It was moving at a speed of 35 to 40 knots.

Agent Giammillaro and his crew observed a catamaran moving at low speed in the creek. There were no other boats in the creek and Agent Giammillaro decided to turn his vessel around and investigate the catamaran. He made a U turn and approached the catamaran on its port side, matching the catamaran's speed. The Customs vessel's spot light and blue lights were turned on, and Agent Giammillaro observed two people on the deck of the catamaran.

Agent Giammillaro did not converse with the two individuals, but heard one of the crew members ask where the two men were coming from, where they were headed and how many people were on board the catamaran. These are routine questions which are asked when a vessel is stopped. Agent Giammillaro did not hear the answers, but his crew relayed to him that the two men were coming from Key West, that they were headed to a marina in Key Largo and that there were only two people on board. The two crew members then boarded the catamaran. None of the agents had his weapon drawn.

On cross examination, Agent Giammillaro testified that the area of Angelfish Creek was quite dark at the time, which was approximately 2:30 a.m.. He stated that the Customs boat was displaying the United States and Customs flags, but the flags were not independently lighted. When the Customs vessel first went past the catamaran, it is possible that the people on deck did not know that it was a government boat.

Agent Giammillaro related that at the time the catamaran first was spotted, it was traveling by motor power at approximately 7 miles per hour, with no appreciable wake. The agent did not observe anything illegal at that time, but was suspicious because this was the only boat in the area. The catamaran's running lights were on, and Agent Giammillaro believed that the sails were

down. After the Customs vessel turned on its lights, the catamaran continued to move, but no one had requested that its engine be turned off.

Agent Giammillaro did not board the catamaran. Ten to fifteen minutes after the crew members boarded the vessel, the two persons on deck were taken into custody and placed on board the Customs boat. Defendant King was put back on the catamaran because the Customs agents were unable to start its engine. Agent Giammillaro decided to take the detainees and the catamaran to Bayfront Park in Homestead, Florida, a two to three hour journey. During that time, defendant King remained handcuffed on the catamaran. Insect spray was administered to him.

Although defendant King was not formally placed under arrest, Agent Giammillaro acknowledged that he was in custody and not free to leave from the time he was brought on board the Customs vessel. The defendant was advised that he was being detained for suspicion of alien smuggling. Since the defendant was to be turned over to agents from Homeland Security.

Agent Giammillaro related that the sun did not rise that morning until approximately one and one-half hours after they arrived in Homestead. Upon arrival, the defendant was placed on a bench under a canopy. The agent was certain that King's companion, whose name was Holz, had invoked his right to counsel, but he did not recall the defendant saying that he wanted a lawyer. Nevertheless, Agent Giammillaro did not hear any questions posed to the defendant.

CBP Agent Babcock testified that he has been employed as a Customs marine interdiction agent for the past three years. Prior to that he was employed for three years as an officer with Florida Fish and Wildlife. During the early morning of September 9, 2011, Agent Babcock was on routine patrol in Angelfish Creek. At that time, the creek itself was dark. The agent observed a sailboat with its running lights on. The Customs vessel also had its running lights on.

As the Customs vessel approached the catamaran, Agent Rodriguez identified the agents as United States Customs Officers, and asked the men on deck where they were coming from, where they were going and how many people were on board. Defendant King responded that they were coming from Key West, were headed for Gilbert's Marina in Key Largo and there were two

people on board. Agents Rodriguez and Babcock then boarded the vessel. Defendant King produced his driver's license and the catamaran's registration.

Agent Babcock then asked King for permission to look in the two cabins, which King granted. The agent first went into the port cabin, where he found a nautical chart of the Bahamas. When he came back on deck, he asked King if there was anything else on the boat that he should know about, and King stated there was not. Agent Babcock then asked permission to look inside the starboard cabin, which King granted. When the agent entered the starboard cabin, he observed some human hair. He moved a blanket aside and found a woman who had been partially concealed by the blanket.

Agent Babcock then drew his firearm and asked the woman to show her hands. After she did so, the agent took her topside, patted her down for weapons and seated her on the deck. Agent Babcock then holstered his weapon, and asked King why he had not told him about the woman and inquired where she had come from. King replied that they had picked the woman up in Marathon and stated that he had not mentioned her because he was scared. Agent Babcock then re-drew his firearm and went back into the starboard cabin. There he found another individual, this one a male. The agent brought the man on deck as well. He did not converse with either of the two people who had been found in the starboard cabin because they did not appear to speak English. Both of them had passports from the country of Georgia.

King and Holz were then brought aboard the Customs vessel. They were placed in handcuffs and given life jackets. Subsequently the agents discovered that they needed King's help with the catamaran. Agent Babcock instructed King to sit in front of him so the agent could keep an eye on him. At one point, King asked permission to move his position because he was getting splashed. He was allowed to move, after which King voiced no other complaints. King was handcuffed at all times except when he started the catamaran's engine.

On cross examination, Agent Babcock testified that there had been nothing suspicious about the catamaran at the time he first observed it. The agent stated that he had made drug arrests

4

in Angelfish Creek in the past.  Agent Babcock also stated that he had not conversed with the aliens because they did not appear to speak English.

Agent Rodriguez told Agent Babcock that Holz had invoked his right to counsel and that no further questions should be asked.  Later Agent Babcock overheard some conversation with Holz but this did not involve questioning by other agents.  Agent Babcock did not hear King invoke his right to counsel.  Holz told Agent Babcock that he was "tripping," and the agent later learned that Holz had been involuntarily committed under the Baker Act.

CBP Agent Juan Rodriguez testified that he has been employed with Customs for more than four years, and has been assigned to the marine interdiction unit for two years.  Prior to joining Customs the agent had served in the United States Army.  Agent Rodriguez testified that his duties involve patrolling Customs waters to look for contraband and illegal aliens.  He has been trained in Immigration and Customs Law, as well as in boat handling.

During the early morning hours of September 9, 2011, Agent Rodriguez was on board a Customs vessel patrolling in Angelfish Creek in the area of Key Largo.  He and the other agents on board spotted a catamaran and determined to conduct a stop.  The Customs vessel's captain turned on the blue lights after pulling alongside the catamaran.  Agent Rodriguez asked the captain of the catamaran where he was coming from, where he was going and how many persons were on board.  The captain, later identified as defendant King, responded that they were coming from Key West, were headed to Gilbert's Marina in Key Largo, and that the only two people on board were King and his mate.  Agent Rodriguez advised King that he was coming aboard for a document check.

After Agent Rodriguez and Agent Babcock boarded the catamaran, Agent Rodriguez asked again how many people were on the vessel, and King again replied that there were only two. Agent Babcock asked permission to look in the compartments, which was given.  Agent Babcock first entered the port side cabin.  When he returned topside, he asked permission to enter the starboard cabin, which King granted.  Shortly thereafter, Agent Babcock brought up on deck a

female.  King then stated that there was another person below deck.  Agent Babcock re-entered the starboard cabin and came back with a male.

Agent Rodriguez related that after the second individual was brought onto the deck, Holz and King were placed in handcuffs for the safety of the agents.  The two men were seated and were given life jackets.  Agent Rodriguez tried to speak to the two people who had been below deck in English and in Spanish, but received no reply from them.  Agent Rodriguez then asked King to tell him the truth about what was going on, but King did not respond.  When they arrived at Bayfront Park, Agent Rodriguez sprayed King and Holz with insect repellent and gave them water.  Holz stated that he wanted a lawyer, after which Agent Rodriguez advised him of his <u>Miranda</u> rights.

On cross examination, Agent Rodriguez testified that the catamaran was displaying a spot light as well as running lights, and it was easily visible.  The agent acknowledged that he did have some communication with the male alien, who stated that he had lived in New York and also produced his passport.  Agent Rodriguez also related that when Holz invoked his right to counsel, he told King to ask for a lawyer, but King did not do so.  However, the agent admitted that in a report he had prepared that same day, he stated that "they" asked for a lawyer.  Agent Rodriguez did not ask any questions of Holz or King.

On redirect, Agent Rodriguez stated that the spotlight was held by Holz.  Since the catamaran was slightly higher than the Customs vessel, the spotlight would have illuminated the side of the Customs boat.  He reiterated that all questioning ceased when Holz stated that he wanted a lawyer.

Homeland Security Investigations Agent Thomas Roberts testified that he has been employed with that agency for four and one-half years.  Prior to that, he was an officer with Customs and Border Protection.  His current duties involve the investigation of drug and alien smuggling, as well as terrorism.  Agent Roberts stated that on the morning of September 9, 2011, he received a duty call directing him to respond to the Bayfront Marina in Homestead, Florida.  He arrived at the

marina at 5:20 a.m., and recalled that the sun had not yet risen. At the time of his arrival, the marine interdiction agents appeared to have just arrived and were mooring their boat.

Agent Roberts noted that the marine interdiction agents had four individuals in custody. All four were placed in the rest area of the marina. At that time, Agent Roberts had no contact with any of the four people. He observed that they were offered water on numerous occasions and that insect spray was applied to all four. Agent Roberts noted that all four people were suntanned and needed showers, and opined that their condition was consistent with multiple days at sea.

Later that day, Agent Roberts took defendant King to the Customs office. Agent Roberts identified Government's Exhibit 12 , in evidence, as a standard Immigration and Customs Enforcement (ICE) Statement of Rights Form, which was read to King. King also read the form himself and initialed each Right listed on the form. In addition, King signed the Waiver of Rights printed at the bottom of the form. Agent Roberts watched King read, initial and sign the form, and the agent also signed it as a witness.

Agent Roberts also identified Government's Exhibits 13 and 14. Exhibit 13 is a handwritten statement of King, containing an amendment by King at the bottom. Agent Roberts was not present when this was done. Exhibit 14 is a consent to search King's cell phone executed by King.

On cross examination, Agent Roberts testified that he had not been told that King had requested a lawyer. Agent Roberts acknowledged that once this occurs, he cannot ask again if the individual who made the request if he wants to waive his rights. However, the person might still be given the Statement of Rights form as evidence that rights had been administered. The agent also conceded that he did not have a search warrant for the cell phone. He further testified that he had been informed that the owner of the catamaran had been contacted and had denied knowledge of King.

Homeland Security Investigative Agent Deborah Trajkovic testified that she has held her position for nine years. It entails the investigation of human smuggling, drug offenses, money laundering, identity fraud and other crimes. She received training at the Federal Law Enforcement Training Center at the time she was hired. She also has received training in criminal investigation and Customs law, including instruction in interrogation and investigative techniques.

On September 9, 2011, Agent Trajkovic responded to the a duty call directing her to the Bayfront Park Marina in Homestead, Florida. When she arrived, Agent Roberts and other agents were present. She was advised that a vessel had been intercepted in Angelfish Creek, and that both of the suspects had invoked their right to remain silent. She observed defendant King seated at a dock under a canopy, as depicted in Government's Exhibit 10, in evidence. Agent Trajkovic offered King food, water and insect spray, and purchased water for him at his request. Both suspects were handcuffed in front so that they were able to smoke.

While Agent Trajkovic and the other agents were filling out paperwork, communicating with the U.S. Attorney and agents in Key West and making arrangements to transport the suspects and process the aliens, she asked no questions of defendant King. However, King asked Agent Trajkovic what they were being arrested for. Agent Trajkovic responded that they were being held for human trafficking and possibly for theft of a vessel. She explained that the owner of the vessel had denied any knowledge of what was going on. King then volunteered that the owner had full knowledge and had instructed King and Holz to pick up the two aliens who were potentially going to do business with the vessel owner. Agent Trajkovic asked no questions and did not talk further with the defendant while he was seated on the deck.

Subsequently, King was taken to HSI headquarters, where Agent Trajkovic obtained biographical information from him for booking purposes. She then read King his <u>Miranda</u> rights, and King stated that he wanted to waive those rights. He provided a written statement (Ex. 13) and then asked to go to the restroom. When King returned from the restroom, he advised Agent Trajkovic that he wanted to change his statement. He was permitted to amend the statement, after

which he gave Agent Trajkovic an envelope containing cash which King said had come from the Russian on the vessel.  The envelope had been hidden in King's underwear and had gone undetected by the detaining agents.  Agent Trajkovic also explained that King's statement referred to his cell phone, prompting the agent to obtain written consent to search the phone (Ex. 14).

On cross examination, Agent Trajkovic testified that her first contact with King occurred five or ten minutes after her arrival at the marina.  At that time, the agent moved King's handcuffs to the front so that he would be able to smoke and drink.  Agent Trajkovic was present when the group supervisor advised King of the reason for his detention.  The agent also testified that she had learned from a Key West agent who had interviewed the vessel owner that the owner had stated that he did not know where his boat was.

Agent Trajkovic related that she obtained the written statement from King at 10 a.m.  She conceded that after King had waived his rights and agreed to speak to her, she told him that Customs was interested primarily in the vessel owner.  Agent Trajkovic did not interview the two aliens.

The defendant exercised his right not to testify or present any evidence.

## II. RECOMMENDATIONS OF LAW

At the conclusion of the hearing, counsel for defendant King confined his argument to the issue of whether King had initiated conversation with Agent Trajkovic, thereby negating his prior invocation of his right to remain silent and request for counsel.  Counsel contended that the agent deliberately provoked King by telling him that the vessel owner had denied knowledge of what was going on with his boat.  Counsel also argued that King had been worn down by the long voyage and hours of waiting outside with little information about what was occurring.

Counsel for the Government argued that although there was no evidence that King had invoked his right to remain silent and to have counsel present, he had been treated as if he had done so.  Counsel pointed out that the questions posed to King while he was still on board the catamaran occurred before he was taken into custody.  Later King initiated conversation with Agent

9

Trajkovic and chose to give additional information in response to her answer to his question. At that point, it was permissible to re-advise King of his Miranda rights. There was no evidence that the defendant did not understand his rights, and the statement was written in his own hand.

Although the evidence is ambiguous, the undersigned assumes for purposes of this analysis that defendant King invoked his right to counsel at the same time as this right was invoked by Holz. The law is clear that a suspect's "invocation of his right to counsel under either the Fifth of Sixth Amendment bars subsequent interrogation by law enforcement outside the presence of an attorney unless the exchange is prompted by the defendant." United States v. Grimes, 911 F.Supp. 1485, 1491 (M.D. Fla. 1996), citing Michigan v. Jackson, 475 U.S. 625, 636 (1986) and Edwards v. Arizona, 451 U.S. 477, 485 (1981). The Eleventh Circuit has stated that '[i]f a suspect clearly, of his own volition, changes his mind about wanting counsel, we see nothing . . . to require that the withdrawn request for counsel continue in force." Moore v. Dugger, 856 F.2d 129, 133 (11th Cir. 1988). Factors to be considered in determining whether a defendant voluntarily initiated a confession or statement are the amount of time between the invocation of his right to counsel and the statement; whether law enforcement offered anything in exchange for the statement and whether aspects of the statement are exculpatory. Henderson v. Singletary, 968 F.2d 1070, 1074-76 (11th Cir. 1992).

In the instant case, no Government agent questioned defendant King after Holz expressed his wish for an attorney and instructed King to do the same. It was defendant King who, hours later, initiated a conversation with Agent Trajkovic. The agent answered King's question, which King chose to respond to by implicating the vessel owner. At that point, Agent Trajkovic was entitled to re-advise King of his rights and ask if he wished to talk to her outside the presence of an attorney. King signed executed a written waiver of rights and made a statement in his own handwriting, which he subsequently amended. Prior to that time, the defendant was seated in the shade, given water and allowed to smoke. No threats or promises were made to him, and King's

statement was at least partially exculpatory, placing most of the blame for the criminal conduct on the vessel owner.

Based on these factors, the undersigned finds that defendant King voluntarily initiated communication with Agent Trajkovic and that his waiver of all Miranda rights was intelligent, knowing and voluntary. Following the defendant's prompting the conversation with the agent, she was entitled to re-advise the defendant of his rights and obtain a statement from him. The undersigned further finds that all statements made by King while on board the catamaran where non-custodial in nature and Miranda warnings were not required.

### III. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the defendant Jonathan Wesley King's Motion to Suppress Evidence and Statements (DE 40) be DENIED.

The parties will have 14 days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable Jose E. Martinez, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1998), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 15th day of December, 2011.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

AUSA James Swain (MIA)
AFPD Stewart Abrams (MIA)
Samuel Fields, Esq.